UNITED STATES BANKRUPTCY COURT

DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>JONATHAN PAUL BALDWIN and<br>LYNN ANN BALDWIN,<br><br>      Debtors. | Case No. 11-00474<br>Chapter 7 |
| DANE S. FIELD,<br><br>      Plaintiff,<br><br>vs.<br><br>JONATHAN PAUL BALDWIN and<br>LYNN ANN BALDWIN,<br><br>      Defendants. | Adv. Pro. No. 11-90043<br><br><br><br><br><br>Re: Docket No. 1 |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The trial in this adversary proceeding was held on February 6, 2012. Simon Klevanksy and Nicole Stucki represented plaintiff Dane S. Field, trustee, and Lloyd Poelman represented defendants Jonathan and Lynn Baldwin (the "Baldwins"). Based on the evidence, the court makes the following

### FINDINGS OF FACT:

1. Mrs. Baldwin is the daughter, and Mr. Baldwin the son-in-law, of George Lindell. Mr. Lindell was the president and sole shareholder of The

Mortgage Store, Inc. ("TMS"), at least until December 31, 2008.

    2.    TMS was in the business of mortgage brokerage and mortgage lending. TMS filed a chapter 7 bankruptcy petition in November 2010. Plaintiff Dane S. Field is the bankruptcy trustee of TMS.

    3.    During the period from 2002 through 2008, Mr. and Mrs. Baldwin had modest income. Their adjusted gross income was $30,824 in 2002, $47,185 in 2003, and only $9,160 in 2004. Their adjusted gross income jumped to $121,478 in 2005, but $78,664 of that amount was a one-time gain from the sale of a residence. In 2006, their adjusted gross income was $56,608, but this consisted of reported gains on sale of a house of $73,298 and a <u>loss</u> of $21,970 on their other business activities. In 2007, their adjusted gross income was only $3,294. In 2008, their adjusted gross income was $33,790.

    4.    During the same period, the Baldwins' expenses substantially exceeded their income. Mrs. Baldwin admitted that they were not good at budgeting and managing their money and spent more than they should have. From 2007, their mortgage payments alone were at least $3,000 per month (even after the Baldwins elected a "negative amortization" payment option, under which their monthly payments were less than the accruing interest, such that the loan balance increased every month). They made ends meet by using credit cards to pay their

U.S. Bankruptcy Court - Hawaii   #11-90043   Dkt # 67   Filed 03/15/12   Page 2 of 11

living expenses. By 2008, their credit card debt had grown to about $75,000.

5. Mr. and Mrs. Baldwin approached her father, Mr. Lindell, for help. He caused TMS to extend a $90,000 line of credit to the Baldwins, secured by a third mortgage on the Baldwins' residence. The Baldwins agreed to pay interest monthly and to pay the principal balance on demand. The Baldwins drew about $75,000 on the line of credit and used the funds to pay off their credit card debt.

6. TMS sent monthly statements to the Baldwins, billing them for the accrued monthly interest. The first two monthly statements bore handwritten notations stating "no payment due," but none of the succeeding statements bore any such notation and all of them unequivocally stated that interest was due and payable. The Baldwins never repaid a penny of the loan.

7. The Baldwins did not intend to repay the TMS loan at the time they accepted that loan. Their testimony to the contrary is not credible.

    a. Mr. and Mrs. Baldwin testified that Mr. Baldwin was starting a landscaping business which they hoped would produce enough income to cover their living expenses and their debts, including their debt to TMS. I did not believe this testimony. Mr. and Mrs. Baldwin had attempted to start several businesses. Mr. Baldwin worked for a while as a mortgage broker at TMS, but quit. They attempted to start an online media business, which apparently never got

3

off the ground. Mr. Baldwin had apparently worked in landscaping at some prior point, but had abandoned that field. They could not have believed that a new business would reverse their fortunes so dramatically as to solve their financial problems and enable them to repay the TMS loan. Any such belief would have been so implausible and unrealistic as to be reckless.

  b. Mr. and Mrs. Baldwin testified that they had an oral agreement with Mr. Lindell pursuant to which Mr. Baldwin would repay the debt to TMS by providing landscaping services for Mr. Lindell's personal residence. I did not believe this testimony either.

    i. The Baldwins offered no evidence to corroborate their testimony that such an agreement existed. All of the pertinent evidence is inconsistent with that testimony.

    ii. TMS sent the Baldwins monthly statements of the interest payments due. If the Baldwins had an agreement of the kind they described, they would have responded to the statements by providing a bill for the landscaping work which Mr. Baldwin had done. They never objected to any of the statements and never billed TMS or Mr. Lindell for any landscaping services.

    iii. The only accounting that Mr. Baldwin ever provided for his work was prepared for purposes of this litigation, and it is uncorroborated and

4

U.S. Bankruptcy Court - Hawaii   #11-90043   Dkt # 67   Filed 03/15/12   Page 4 of 11

implausible.

    iv. In their bankruptcy schedules, Mr. and Mrs. Baldwin stated under penalty of perjury that they owed TMS $90,354.00, which was approximately equal to the unpaid principal and interest on the loan without any reduction for the alleged landscaping services. They did not list as an asset any amount owed to them for landscaping services on Mr. Lindell's residence. Their trial testimony about the agreement for landscaping services is a recent fabrication.

  c. The Baldwins contend that they believed they could repay the TMS loan by waiting for their home to appreciate in value and then selling or refinancing it. They contend that this belief was reasonable and that, during the real estate boom, many people shared it. The Baldwins did not actually harbor that belief when they sought and obtained the TMS loan in 2008. The Baldwins had previously resolved debt problems by selling or refinancing homes. If they could have done so again in mid-2008, when their credit card debt got out of control, they would have done so. But by that time the real estate market had collapsed and they could not use the value of their home to repay their credit card debts. They did not believe, and could not reasonably have believed, that the real estate market would reverse itself and rise so quickly as to permit them to repay the TMS loan.

5

d. Mr. and Mrs. Baldwin never had the wherewithal to make the monthly payments when due, let alone full repayment of the principal on demand as the note provided. They had no remotely plausible basis on which to believe that their fortunes would change. They knew they could not and would not be able to repay the loan but requested and accepted it nevertheless. They never made any attempt to repay the loan.

8. The Baldwins' financial condition continued to deteriorate after the TMS loan. In 2009, their adjusted gross income was $39,249. In 2010, their adjusted gross income was $50,486. By 2010, they had three children. Their expenses continued to outstrip their income, and they quickly returned to the practice of making ends meet with credit cards.

9. In February 2011, the Baldwins commenced a chapter 7 bankruptcy case. According to their bankruptcy schedules, they had amassed over $100,000 of credit card debt, all after they paid off their credit cards with the TMS loan in mid-2008.

10. As of January 1, 2012, the Baldwins owed TMS $96,663.11. Interest continues to accrue at seven percent (7%) per annum until the entry of judgment.

6

U.S. Bankruptcy Court - Hawaii   #11-90043   Dkt # 67   Filed 03/15/12   Page 6 of 11

Based on the foregoing findings of fact, the court makes the following

**CONCLUSIONS OF LAW**:

1. The court has jurisdiction over this adversary proceeding, which is a core proceeding in bankruptcy. 28 U.S.C. § 157(b)(2)(I). Venue is proper.

2. The plaintiff contends that TMS' claims against the Baldwins are not dischargeable under section 523(a)(2) of the Bankruptcy Code.

3. Exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor. Snoke v. Riso (In re Riso), 978 F.2d 1151, 1154 (9th Cir. 1992); see also National Union Fire Insurance Co. of Pittsburgh v. Bonnanzio (In re Bonnanzio), 91 F.3d 296, 300 (2d Cir. 1996); Meyer v. Rigdon, 36 F.3d 1375, 1385 (7th Cir. 1994).

4. The plaintiff seeking to establish an exception to the discharge bears the burden of proof. Fed. R. Bankr. P. 4005; see also In re Niles, 106 F.3d 1456, 1464-65 (9th Cir. 1997). The plaintiff must meet this burden by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 286 (1991); Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman), 234 F.3d 1081, 1085 (9th Cir. 2000).

5. Section 523(a)(2)(A) of the Bankruptcy Code provides:

A discharge under . . . this title does not discharge an individual

7

U.S. Bankruptcy Court - Hawaii   #11-90043   Dkt # 67   Filed 03/15/12   Page 7 of 11

    debtor from any debt -

* * *

    (2)    for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by -

        (A)    false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . .

11 U.S.C. § 523(a); see also Cohen v. de la Cruz, 523 U.S. 213, 218-22 (1998).

    6.    To prevail on a claim under § 523(a)(2)(A), a creditor must demonstrate five elements:

    (1)    misrepresentation, fraudulent omission or deceptive conduct by the debtor;

    (2)    knowledge of the falsity or deceptiveness of his statement or conduct;

    (3)    an intent to deceive;

    (4)    justifiable reliance by the creditor on the debtor's statement or conduct; and

    (5)    damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.

In re Weinberg, 410 B.R. 19, 35 (B.A.P. 9th Cir. 2009); In re Slyman, 234 F.3d at 1085; Am. Express Travel Related Servs. Co. v. Hashemi (In re Hashemi), 104 F.3d 1122, 1125 (9th Cir. 1996).

U.S. Bankruptcy Court - Hawaii   #11-90043   Dkt # 67   Filed  03/15/12   Page 8 of 11

7. "[A] promise made with a positive intent not to perform or without a present intent to perform satisfies § 523(a)(2)(A)." In re Rubin, 875 F.2d 755, 759 (9th Cir. 1989) (internal quotations omitted). In addition, "where the promisor knew or should have known of his prospective inability to perform, the promise can be found to be fraudulent." In re Barrack, 217 B.R. 598, 606 (B.A.P. 9th Cir. 1998) (internal quotations omitted). A complete failure to take steps towards carrying out a promise can support an inference that the promisor never intended to perform. In re Barnette, 281 B.R. 869, 876 (Bankr. W.D. Pa. 2002).

8. Incurring debt "without a reasonable prospect of ability to repay or to meet its contract terms is circumstantial evidence from which a court may infer a fraudulent intent." In re Eashai, 167 B.R. 181, 185 (B.A.P. 9th Cir. 1994).

9. "[D]eclarations made with reckless indifference for the truth may be found to be fraudulent." Chase Manhattan Bank v. Fordyce (In re Fordyce), 56 B.R. 102, 105 (Bankr. M.D. Fla. 1985).

10. The plaintiff argues that evidence of the alleged agreement to repay the loan via landscaping services should be excluded under the parol evidence rule. Despite its name, the parol evidence rule is actually a substantive rule of contract interpretation, not a rule of evidence. Akamine & Sons, Ltd., v. American Sec. Bank, 50 Haw. 304, 309 (1968). Extrinsic evidence is not admissible to

9

change or contradict the terms of an unambiguous written agreement. Id. at 310; Pancakes of Hawaii, Inc., v. Pomare Properties Corp., 85 Haw. 300, 310 (Haw. App. 1997). Extrinsic evidence may be admissible for other purposes, however. I received evidence of the alleged side agreement because it was relevant and admissible to show the Baldwins' subjective intent to carry out their promises. (As noted above, however, I did not believe that evidence.)

11. The plaintiff also argues that evidence of the alleged side agreement is inadmissible under F.D.I.C. v. Figge, 928 F.2d 1136 (9th Cir. 1991) and D'Oench v. F.D.I.C., 315 U.S. 447 (1942). These cases, however, are inapplicable because they rest on 12 U.S.C. § 1823(e), which applies only to the Federal Deposit Insurance Corporation.

12. The Baldwins never intended to repay the loan from TMS. The Baldwins' debt to TMS is therefore not dischargeable under section 523(a)(2)(A).

U.S. Bankruptcy Court - Hawaii    #11-90043    Dkt # 67    Filed  03/15/12    Page 10 of 11

## CONCLUSION

The Baldwin's debt to TMS, in the amount of $96,663.11 plus interest at seven percent (7%) per annum from January 1, 2012, to the entry of judgment and at the federal judgment rate thereafter, is not dischargeable in bankruptcy. Counsel for plaintiff shall submit an appropriate final judgment.

/s/ Robert J. Faris
United States Bankruptcy Judge
Dated: 03/15/2012